IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>      Plaintiff,<br><br>v.<br><br>OASIS INTERNATIONAL GROUP, LIMITED; OASIS MANAGEMENT, LLC; SATELLITE HOLDINGS COMPANY; MICHAEL J. DACORTA; JOSEPH S. ANILE, II; RAYMOND P. MONTIE, III; FRANCISCO "FRANK" L. DURAN; and JOHN J. HAAS,<br><br>      Defendants;<br><br>and<br><br>MAINSTREAM FUND SERVICES, INC.; BOWLING GREEN CAPITAL MANAGEMENT LLC; LAGOON INVESTMENTS, INC.; ROAR OF THE LION FITNESS, LLC; 444 GULF OF MEXICO DRIVE, LLC; 4064 FOUNDERS CLUB DRIVE, LLC; 6922 LACANTERA CIRCLE, LLC; 13318 LOST KEY PLACE, LLC; and 4OAKS LLC;<br><br>Relief Defendants | Case No.  8:19-cv-886-VMC-SPF |

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF,
CIVIL MONETARY PENALTIES, RESTITUTION, DISGORGEMENT
AND OTHER EQUITABLE RELIEF**

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by

and through its attorneys, alleges as follows:

# I. SUMMARY

1. Since 2011, Defendants Oasis International Group, Limited ("OIG"), Oasis Management, LLC ("OM"), Satellite Holdings Company ("Satellite Holdings"), Michael J. DaCorta ("DaCorta"), Joseph S. Anile, II ("Anile"), Raymond P. Montie, III ("Montie"), Francisco "Frank" L. Duran ("Duran"), and John J. Haas ("Haas"), (collectively, "Defendants") have engaged in a fraudulent scheme to solicit and misappropriate money from over 700 U.S. residents for pooled investments in retail foreign currency contracts ("forex"). Between mid-April 2014 and the present (the "Relevant Period"), Defendants have fraudulently solicited hundreds of members of the public ("pool participants") to invest approximately $75 million in two commodity pools—Oasis Global FX, Limited ("Oasis Pool 1") and Oasis Global FX, SA ("Oasis Pool 2") (collectively, the "Oasis Pools")—that purportedly would trade in forex. Rather than use pool participants' funds for forex trading as promised, however, Defendants have traded only a small portion of pool funds in forex— which trading incurred losses—and instead misappropriated the majority of pool participants' funds and issued false account statements to pool participants to conceal their trading losses and misappropriation.

2. In the course of their fraudulent scheme and during the Relevant Period, Defendants made material misrepresentations to pool participants, including that: (1) all pool funds would be used to trade forex; (2) pool participants would receive a minimum 12% guaranteed annual return from this forex trading; (3) the Oasis Pools were profitable and returned 22% in 2017 and 21% in 2018; (4) the Oasis Pools had never had a losing month; (5) money being returned to pool participants was from profitable trading; (6) there was no

risk of loss with the Oasis Pools; and (7) pool participants earned extra returns by referring other pool participants to the Oasis Pools. Defendants also omitted to tell pool participants, among other things, that DaCorta—the CEO of OIG and the Oasis Pools' head trader—had been permanently banned from registering with the Commission in 2010 and was prohibited from soliciting U.S. residents to trade forex and from trading forex for U.S. residents in any capacity.

3.     Defendants' representations were false. The Defendants have misappropriated the majority of pool funds. Of the approximate $75 million Defendants received from pool participants during the Relevant Period, Defendants deposited only $21 million into forex trading accounts in the names of the Oasis Pools, all of which has been lost trading forex. Defendants misappropriated over $28 million of pool funds to make Ponzi-like payments to other pool participants. Defendants misappropriated over $18 million of pool funds—at least $7 million of which was transferred to Relief Defendants—for unauthorized personal or business expenses such as real estate purchases in Florida, exotic vacations, sports tickets, pet supplies, loans to family members, and college and study abroad tuition.

4.     To conceal their trading losses and misappropriation, Defendants created and issued false account statements to pool participants that inflated and misrepresented the value of the pool participants' investments in the Oasis Pools and the Oasis Pools' trading returns.

5.     By virtue of this conduct and the conduct further described herein, Defendants—either directly or as controlling persons—have engaged, are engaging, or are about to engage in acts and practices in violation of Sections 4b(a)(2)(A)-(C), 4k(2), 4m(1),

4*o*(1)(A)-(B), and 2(c)(2)(iii)(I)(cc) of the Commodity Exchange Act (the "Act"), 7 U.S.C.

§§ 6b(a)(2)(A)-(C), 6k(2), 6m(1), 6*o*(1)(A)-(B), 2(c)(2)(iii)(I)(cc) (2012), and Commission

Regulations ("Regulations") 4.20(b)-(c), 4.21, 5.2(b)(1)-(3), and 5.3(a)(2), 17 C.F.R.

§ 4.20(b)-(c), 4.21, 5.2(b)(1)-(3), 5.3(a)(2) (2018).

6.     Unless restrained and enjoined by this Court, Defendants will likely continue

to engage in acts and practices alleged in this Complaint and similar acts and practices, as

described below.

7.     Accordingly, the Commission brings this action pursuant to Section 6c of the

Act, 7 U.S.C. § 13a-1 (2012), and Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C)

(2012), to enjoin Defendants' unlawful acts and practices, to compel their compliance with

the Act and the Regulations promulgated thereunder, and to enjoin them from engaging in

any commodity-related activity.  In addition, the Commission seeks civil monetary penalties

and remedial ancillary relief, including, but not limited to, trading and registration bans,

restitution, disgorgement, rescission, pre- and post-judgment interest, and such other and

further relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

8.     The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (2012)

(codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (providing that district

courts have original jurisdiction over civil actions commenced by the United States or by any

agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the

Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek injunctive and other

relief against any person whenever it shall appear to the Commission that such person has

engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder. Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2012), subjects the forex solicitations and transactions at issue in this action to, *inter alia*, Sections 4b and 4*o* of the Act, 7 U.S.C. §§ 6b, 6*o* (2012), as further described below.

9.     Venue lies properly in this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(c) (2012), because Defendants transacted business in this District and certain transactions, acts, practices, and courses of business in violation of the Act and the Regulations occurred, are occurring, or are about to occur in this District, among other places.

### III.     THE PARTIES

10.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations promulgated thereunder. The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street NW, Washington, D.C. 20581.

#### A.     Corporate Defendants

11.     Defendant **Oasis International Group, Limited** is a Cayman Islands limited corporation formed in March 2013 by DaCorta, Anile, and Montie. Defendants DaCorta, Anile, and Montie are all members of OIG and also serve on OIG's Board of Directors. DaCorta, Anile, and Montie operate OIG from its office at 444 Gulf of Mexico Drive, Longboat Key, Florida. During the Relevant Period, OIG acted as a commodity pool

operator ("CPO") by soliciting, receiving, and accepting funds from pool participants for investment in the Oasis Pools. OIG is not registered with the Commission in any capacity.

12.     Defendant **Oasis Management, LLC** is a Wyoming limited liability corporation formed in November 2011 with its principal place of business at 318 McMicken Street, Rawlins, Wyoming. During the Relevant Period, OM acted as a CPO for the Oasis Pools by accepting and receiving funds from pool participants in two bank accounts in OM's name at Bank #1for the purpose of investing in the Oasis Pools. OM is not registered with the Commission in any capacity.

13.     Defendant **Satellite Holdings Company** is a South Dakota corporation formed in October 2014. Satellite Holdings's principal place of business is 110 East Center Street, Suite 2053, Madison, South Dakota. Defendant Haas is Satellite Holdings's director. During the Relevant Period, Satellite Holdings acted as a CPO for the Oasis Pools by soliciting, receiving, and accepting funds from pool participants for investment in the Oasis Pools. Satellite Holdings is not registered with the Commission in any capacity.

**B.     Individual Defendants**

14.     Defendant **Michael J. DaCorta** is a resident of Lakewood Ranch, Florida. DaCorta in 2006 was listed with the National Futures Association ("NFA") as a principal and registered with the Commission as an associated person ("AP") of a registered CTA, but he withdrew his listing and registration as part of a 2010 settlement with the NFA. DaCorta co-founded and is a principal shareholder and director of OIG. He is also the chief executive officer and the chief investment officer of OIG and opened and was the sole signatory on OM bank accounts. DaCorta was responsible for all OIG's investment decisions, trading

execution, services, sales, clearing and operations and signed OIG promissory notes. During the Relevant Period, DaCorta acted as an AP for CPOs OM and OIG by soliciting pool participants for investment in the Oasis Pools. DaCorta is permanently banned from registering with the Commission in any capacity, and is therefore not registered with the Commission.

15. Defendant **Joseph S. Anile, II** is a resident of Sarasota, Florida and Lattingtown, New York. Anile co-founded and is a principal shareholder, director, and president of OIG. Anile had responsibility for staffing, guiding, and managing OIG's vision, mission, strategic plan, and direction. Anile controlled OIG bank accounts. Additionally, Anile opened trading accounts for the Oasis Pools. Anile assisted in facilitating real estate purchases with pool funds and making non-forex investments with pool funds. Anile has never been registered with the Commission in any capacity.

16. Defendant **Raymond P. Montie, III**, is a resident of Jackson, New Hampshire. Montie co-founded and is a principal shareholder, director, and vice president of OIG. He was OIG's executive director of sales. During the Relevant Period, Montie acted as an AP of OIG by soliciting pool participants for investment in the Oasis Pools. Montie has never been registered with the Commission in any capacity.

17. Defendant **Francisco "Frank" L. Duran** is a resident of Florida. Duran handles the day-to-day operations of OIG and generally assists DaCorta with OIG's operations. During the Relevant Period, Duran acted as an AP of CPO OIG by soliciting pool participants for investment in the Oasis Pools. Duran has never been registered with the Commission in any capacity.

18.     Defendant **John J. Haas** is a resident of New York.  Haas is the sole director of Satellite Holdings and opened and was the sole signatory on Satellite Holdings bank accounts.  Haas signed Satellite promissory notes.  Haas was in charge of assisting pool participants who wished to invest their retirement funds in the Oasis Pools.  During the Relevant Period, Haas acted as an AP for CPOs Satellite Holdings and OIG by soliciting pool participants for investment in the Oasis Pools.  Haas has never been registered with the Commission in any capacity.

**C.     Relief Defendants**

19.     **Relief Defendant Mainstream Fund Services, Inc.** is a New York corporation that is a third-party administrator for the financial services industry**.**  During the Relevant Period Mainstream held three accounts at Bank #2 (accounts XXXXXX1174, XXXXXX5606, and XXXXXX0764) that received, directly or indirectly, over $33 million from pool participants for investment in the Oasis Pools.  These Mainstream accounts have no legitimate claim to pool participants' funds and did not provide any services for the Oasis Pools or pool participants.  The Mainstream Accounts acted as pass-through accounts from which pool funds were transferred to a forex trading account in the United Kingdom, or to the Defendants, or to other businesses owned or controlled by Defendants.  Mainstream was formerly named Fundadministration Inc. ("Fundadministration"), but changed its name to Mainstream in 2017.

20.     **Relief Defendant Bowling Green Capital Management LLC** ("Bowling Green") is a New York limited liability company with an address of 26 Ludlam Avenue, Bayville, New York.  DOS process for Bowling Green is Anile.  Bowling Green has a bank

7

account at Bank #3 that received over $2.1 million in pool funds during the Relevant Period. Anile and MaryAnne E. Anile ("M. Anile") are the only signatories on this account. Bowling Green has no legitimate claim to pool funds and did not provide any services for the Oasis Pools or pool participants.

21.     **Relief Defendant Lagoon Investments, Inc. ("Lagoon")** is a South Dakota corporation with its principal place of business at 110 East Center Street, Suite 2053, Madison, South Dakota. In May 2015, Anile filed an application for Lagoon to transact business in Florida. DaCorta and Anile are the sole directors and officers of Lagoon. Lagoon has a bank account at Bank #4 that received $318,038.33 of pool funds during the Relevant Period, and pool funds are the only source of funds in the account. Anile and DaCorta are the sole signatories on this account. Lagoon has no legitimate claim to pool funds and did not provide any services for the Oasis Pools or pool participants.

22.     **Relief Defendant Roar of the Lion Fitness, LLC ("Roar of the Lion"),** is a Florida limited liability company located at 13313 Halkyn Point, Orlando, Florida. Andrew DaCorta ("A. DaCorta") is authorized to manage Roar of the Lion. Roar of the Lion has a bank account at Bank #1 that received over $71,000 of pool funds during the Relevant Period, and pool funds are the only source of funds in the account. DaCorta and A. DaCorta are the sole signatories on the account. Roar of the Lion has no legitimate claim to pool funds and did not provide any services for the Oasis Pools or pool participants.

23.     **Relief Defendant 444 Gulf of Mexico Drive, LLC ("444")** is a Florida limited liability company with its principal place of business at 8374 Market Street, #421, Bradenton, Florida. OIG is authorized to manage 444. 444 has a bank account at Bank #1

that received over $834,000 of pool funds during the Relevant Period, and pool funds are the only source of funds in the account. DaCorta and Anile are the sole signatories on this account. Additionally, 444 owns an office building located at 444 Gulf of Mexico Drive, Longboat Key, Florida, that was purchased with pool funds. 444 has no legitimate claim to pool funds or property purchased with pool funds and did not provide any services for the Oasis Pools or pool participants.

24.     **Relief Defendant 4064 Founders Club Drive, LLC** ("4064 Founders Club") is a Florida limited liability company with its principal place of business at 8374 Market Street, Unit 421, Bradenton, Florida. Anile is the authorized representative of 4064 Founders Club and the registered agent. 4064 Founders Club has a bank account at Bank #1 that received over $590,000 of pool funds, and pool funds are the only source of funds in the account. Anile and M. Anile are the sole signatories on this account. Additionally, 4064 Founders Club purchased a residence with pool funds in which Anile lives, located at 4064 Founders Club Drive, Sarasota, Florida. 4064 Founders Club has no legitimate claim to pool funds or property purchased with pool funds and did not provide any services for the Oasis Pools or pool participants.

25.     **Relief Defendant 6922 Lacantera Circle, LLC** ("6922 Lacantera") is a Florida limited liability company with its principal place of business at 6922 Lacantera Circle, Lakewood Ranch, Florida. OM is authorized to manage 6922 Lacantera. 6922 Lacantera has a bank account at Bank #1 that received over $212,000 of pool funds, and pool funds are the only source of funds in this account. DaCorta is the sole signatory on the account. Additionally, 6922 Lacantera owns a residence located at 6922 Lacantera Circle,

Lakewood Ranch, Florida that was purchased with pool funds. 6922 Lacantera has no legitimate claim to pool funds or property purchased with pool funds and did not provide any services for the Oasis Pools or pool participants.

26. **Relief Defendant 13318 Lost Key Place, LLC** ("13318 Lost Key") is a Florida limited liability company with its principal place of business at 13318 Lost Key Place, Lakewood Ranch, Florida. OIG is authorized to manage 13318 Lost Key. 13318 Lost Key has a bank account at Bank #1 that received over $265,000 of pool funds, and pool funds are the only source of funds in this account. DaCorta is the sole signatory on this account. Additionally, 13318 Lost Key owns a residence located at 13318 Lost Key Place, Lakewood Ranch, Florida that was purchased with pool funds and in which DaCorta lives. 13318 Lost Key has no legitimate claim to pool funds or property purchased with pool funds and did not provide any services for the Oasis Pools or pool participants.

27. **Relief Defendant 4Oaks LLC ("4Oaks")** is a Florida limited liability company with its principal place of business at 8374 Market Street, No. 421, Lakewood Ranch, Florida. Anile is authorized to manage 4Oaks. 4Oaks has a bank account at Bank #1 that received over $177,000 of pool funds, and pool funds are the only source of funds in this account. Anile and M. Anile are the sole signatories on this account. Additionally, 4Oaks owns a Ferrari that was purchased with pool funds. 4Oaks has no legitimate claim to pool funds or property purchased with pool funds and did not provide any services for the Oasis Pools or pool participants.

## IV. FACTS

### A. The Oasis Common Enterprise

28.     Defendants operate their fraudulent scheme through the following interrelated

domestic and foreign entities:

| Defendant Entities | Corporate Information | Role in Scheme |
|---|---|---|
| OIG | Cayman Islands (2013 - present) | OIG solicits U.S. residents and receives or accepts funds from pool participants for the Oasis Pools in Fundadministration/Mainstream bank accounts.  OIG is owned and directed by DaCorta, Anile, and Montie. |
| OM | Wyoming (2011 - present) | OM receives pool participant funds in its name in Bank #1 bank accounts controlled by DaCorta.  These Bank #1 bank accounts are controlled by DaCorta. |
| Satellite Holdings | South Dakota (October 2014 - present) | Satellite Holdings solicits U.S. residents and receives or accepts funds for the Oasis Pools in its name in Bank #1 bank accounts controlled by Haas.  Satellite Holdings is owned and managed by Haas. |

| Investment Pools | Corporate Information | Role in Scheme |
|---|---|---|
| Oasis Global FX, Limited ("OGFXL") | New Zealand (May 2012 - June 2015) | Some pool funds were transferred to a forex trading account in OGFXL's name at forex firm in the United Kingdom ("UK Forex Firm").  All of the pool funds transferred to this account were lost trading forex. OGFXL is owned by OIG and is licensed as a financial services provider in New Zealand. |
| Oasis Global FX, S.A. ("OGFXS") | Belize (August 2016-present) | Some pool funds were transferred to a forex trading account in OGFXS's name at the UK Forex Firm.  All of the pool funds transferred to this account were lost trading forex.  OGFXS is owned by Anile and is licensed as a financial services provider in Belize. |

29.     Among other things, OIG, OM, and Satellite Holdings share the same office and employees, commingle funds, and operate under one overarching name "Oasis." Additionally, DaCorta and/or Anile own and control OIG, OM, OGFXL, and OGFXS.  Haas owns and controls Satellite Holdings, but also works for OIG.

30.     The Oasis enterprise appears to operate one common website.  During a part of the Relevant Period, the website was located at awww.oasisinternationalgroupltd.com.  According to this website, Oasis "provides an array of asset management and advisory services, including corporate finance and investment banking . . . investment sales/trading and clearing services . . . financial product development, and alternative investment products."

31.     The Oasis website has a banner prominently displayed across the bottom of each page, which states:

> The services and products offered by Oasis International Group Ltd. are *not being offered* within the United States (US) and [are] not being offered to US persons, as defined under US law.  As such, should you reside in, or be a citizen, or a taxpayer of the US or any US territory, any email message received is not intended to serve as a solicitation or inducement on behalf of any of the aforementioned entities.

32.     Despite this disclaimer, Defendants have solicited hundreds of U.S. residents, continue to actively solicit U.S. residents to invest in the Oasis Pools, and have accepted funds for the Oasis Pools from at least 700 U.S. residents.

33.      OIG, OM, and Satellite Holdings had no policies, procedures or financial controls, did not keep regular or accurate books and records, and did not prepare regular or accurate financial or pool performance statements.

## B. DaCorta's Permanent Registration Ban

34.     From November 2006 to August 2010, DaCorta was listed as a principal with NFA and registered with the Commission as an AP of a CTA called International Currency Traders, Ltd. ("ICT"), which offered forex trading to U.S. retail customers.  DaCorta was ICT's President.

35.     In 2009, the NFA—the self-regulatory organization designated by the Commission as a registered futures association—identified several violations of NFA rules by ICT.  Among other things, the NFA discovered that DaCorta and ICT solicited some of their forex customers to loan money to ICT, and that some of those funds were used to make payments to former ICT customers with trading losses in 2007.  The customers who loaned the money to ICT were not told that their money would go to other ICT customers.

36.     In August 2010, DaCorta and the NFA entered into an agreement whereby DaCorta agreed to withdraw from NFA membership and never to re-apply for NFA membership in any capacity, at any time in the future, to avoid an NFA disciplinary action against him and ICT.  Effectively, this meant DaCorta was permanently banned from registering with the Commission as a CPO, CTA, or as an AP or principal of a CPO or CTA.

37.     During the Relevant Period, Defendants did not disclose to pool participants that DaCorta was permanently banned from registering with the Commission and could not solicit investments or invest for others in, among other things, retail forex.

## C. Defendants' Unprofitable Trading

38.     In or around April 2015, Anile opened a forex trading account at the U.K Forex Broker.  The forex trading account was held in the name of and for the benefit of

OGFXL, which is a New Zealand company owned by OIG. DaCorta is the president and Anile is the vice president of OGFXL. Anile and DaCorta were the only signatories on this forex trading account, and DaCorta was the only person authorized to trade the account. Approximately $1,650,000 was deposited into the account. The account suffered net trading losses of approximately $1,654,000 and was closed February 7, 2017.

39.     In or around December 2016, Anile opened another forex trading account at the UK Forex Broker. This forex trading account was held in the name of and for the benefit of OGFXS, a Belizean company owned by Anile. Anile is the only signatory on the account, yet indicated on the account opening documents that another person would trade the account. DaCorta also traded this account. Between January 2017 and November 30, 2018, this account received deposits totaling $19,625,000. As of November 29, 2018, this account had total losses of approximately $60 million. As of November 30, 2018, this account remained open with a balance of approximately $750,000.

40.     Through the UK Forex Broker accounts, Defendants engaged in forex transactions on a leveraged or margined basis that did not result in delivery within two days or otherwise create an enforceable obligation to deliver between a seller and buyer that have the ability to deliver and accept delivery, respectively, in connection with their line of business. The trades were leveraged 100:1, which means that the Oasis Pools could trade forex contracts valued at one hundred times the amount of cash in the OGFXL and OGFXS trading accounts.

41.     Defendants do not appear to have traded forex in any other accounts during the Relevant Period.

**D.    Defendants' Fraudulent Solicitations for the Oasis Pools**

42.    During the Relevant Period, Defendants OIG, OM, and Satellite Holdings, by and through DaCorta, Montie, Duran, and Haas (and/or their other employees or agents), fraudulently solicited and obtained over $75 million from approximately 650 pool participants as investments in the Oasis Pools.  Defendants made material misrepresentations and omissions to pool participants and prospective pool participants via the Oasis website, group conference calls hosted by Oasis, telephone calls, in-person meetings, and in promissory notes they executed with pool participants.  Defendants' fraudulent solicitations, as is illustrated by the following representative examples, included, but were not limited to, representations that:

a)    all pool funds would be used to trade forex;

b)    pool participants would receive a minimum 12% guaranteed annual return from forex trading;

c)    the Oasis Pools were profitable and returned 22% in 2017 and 21% in 2018;

d)    the Oasis Pools never had a losing month;

e)    money being returned to pool participants was from profitable trading;

f)    there was no risk of loss with the Oasis Pools; and

g)    pool participants could earn extra returns by referring other pool participants to the Oasis Pools.

43.    In June 2017, pool participant K.M. learned about Oasis from Montie at a retreat Montie hosted at his house in New Hampshire for her and others, all of whom knew Montie through Ambit Energy ("Ambit"), a company with which Montie is affiliated. During the retreat, Montie told K.M. and others the following about the Oasis Pools:

a) Montie was making a sizable profit on his Oasis investment from profitable forex trading;

b) current Oasis pool participants were making between 12% and 25% from Oasis's forex trading;

c) there was little risk of loss associated with the Oasis Pools because Oasis was a middleman for forex trading; and

d) pool funds would be used to trade forex.

44.     Between June and July 2017, K.M. participated in conference calls during which Montie and DaCorta made representations about the Oasis Pools, including:

a) the Oasis Pools were making a guaranteed minimum of 12% per year;

b) there was little risk of loss associated with the Oasis Pools; and

c) pool funds would only be used to trade forex.

45.     Based on Montie's and DaCorta's representations about the Oasis Pools, K.M. invested $20,000 in Oasis in 2017 and $37,500 in 2018, some of which was from her Roth IRA.

46.     In or about October 2017, pool participant G.M. learned about Oasis through Montie, who G.M. knew through Ambit.  Montie told G.M. the following:

a) Montie had known DaCorta for about six years;

b) DaCorta had turned $25,000 into over $31,000 for him in a few months;

c) the Oasis Pools were earning about 20% per year trading forex;

d) the Oasis Pools were low-risk because the forex trading was not dependent on whether the market went up or down; and

e) pool funds would only be used to trade forex.

47.     In December 2017, Montie told G.M. that he could earn additional money by referring others to Oasis because Oasis was able to pay a referral fee from its forex trading profits.

48.     In late October 2018, G.M. participated in an Oasis conference call led by Montie and DaCorta.  The following occurred during the call:

a)  Montie introduced DaCorta and explained how they came to form OIG;

b)  Montie explained that DaCorta turned $25,000 into $31,000 for Montie in a relatively short period of time;

c)  DaCorta explained that he worked on Wall Street from a young age;

d)  DaCorta explained that the Oasis Pools made money trading forex by capturing the bid/ask spread;

e)  DaCorta said the Oasis Pools made a minimum 1% monthly return;

f)  DaCorta said the only risk associated with the Oasis Pools was if all the large banks failed or the dollar collapsed;

g)  DaCorta said the only money at risk was what belonged to Oasis because pool funds were just collateral; and

h)  DaCorta said pool funds would only be used for forex trading and made no mention of pool funds being used to purchase real estate or cars.

49.     In or about August 2018, Montie organized a trip for G.M. and others to visit Oasis's offices on Longboat Key.  Montie arranged the trip to get Oasis pool participants fired up about Oasis and so they would refer others to Oasis.  During the visit, Montie, DaCorta, and others made a presentation about Oasis during which they represented the following:

a)  Oasis had $110 million under management;

b)  Oasis held substantial amounts of cash and had strong financial standing; and

c) Oasis purchased real estate, including the Longboat Key office, from forex trading profits.

50.    G.M. assumed that Montie, as a principal, was receiving Oasis financial statements and other information to verify the representations made about Oasis and the Oasis Pools.

51.    G.M. invested $500,000 in the Oasis Pools beginning in November 2017, based on Montie's and DaCorta's representations about Oasis, approximately $180,000 of which was from his IRA.

52.    In 2017, Montie solicited pool participant M.B. for the Oasis Pools.  M.B. knew Montie and Haas through Ambit.  In late 2017, M.B. participated in an Oasis conference call led by Montie, DaCorta, and Haas with several other prospective pool participants.  The following occurred during the call:

a) Montie introduced DaCorta as his friend and business partner;

b) Montie explained that DaCorta had invested in forex for him several years earlier and had earned "incredible returns" in only sixty days;

c) DaCorta stated that Anile handled the legal, compliance and administrative work for Oasis, Montie handled Oasis's marketing, and DaCorta did the trading for Oasis;

d) DaCorta stated the Oasis Pools guaranteed a minimum 12% annual return, but the Oasis Pools had always returned more than 12%;

e) DaCorta stated if the Oasis Pools did not make 12% a year Oasis would make up the difference;

f) DaCorta stated the Oasis Pools would probably return 24% in 2017;

g) Montie stated the Oasis pools were up 3.6% for the current month;

h) Montie encouraged call participants to text him any questions;

18

i) a call participant asked if Oasis's results were audited and Montie responded that Oasis wasn't audited because it was just getting started;

j) a call participant asked what the risks were with Oasis and DaCorta responded that the only risk associated with the Oasis Pools was if something happened to the banking system and that having money in the Oasis Pools held the same risk as holding funds at a bank or major brokerage firm; and

k) DaCorta stated that the risk with the Oasis Pools was "fairly mundane compared to where you are holding positions in stocks, commodities, etc."

53.     After the conference call, M.B. had several conversations with Haas in which Haas reiterated that:  1) the Oasis Pools returned 12% per year; 2) because Oasis was a market maker, the only risk was if a banking crisis occurred; and 3) pool participants' funds would be sitting at large domestic and international investment banks backing forex trades.

54.     Later, on or about April 1, 2018, M.B. had a call with Montie to ask follow-up questions about Oasis before he sent money to Oasis.  The following occurred during the call:

a) M.B. told Montie "I know you, but I don't know DaCorta and for all I know DaCorta is Bernie Madoff" and asked Montie if he would have access to M.B.'s money after M.B. invested in the Oasis Pools;

b) Montie responded by vouching for DaCorta and explaining that M.B. could get his money out of the Oasis Pools because Montie had access to the Oasis accounts and log-ins to the bank accounts; and

c) Montie told M.B. that the worst thing that could happen if M.B. invested in the Oasis Pools is that M.B. would only get his initial investment back.

55.     Based on Montie's, Haas's, and DaCorta's representations about Oasis, M.B. invested $110,000 in Oasis in 2018, including money from IRAs.

56.     In March or April 2018, Oasis pool participant D.J.C. learned about Oasis through another Oasis pool participant.  D.J.C. also knew Montie through Ambit.  Around

19

that same time, D.J.C. participated in an Oasis conference call with several other prospective

pool participants during which Haas and Montie provided information about the Oasis Pools.

Montie and Haas stated the following on the conference call:

a) Oasis was an investment in forex trading;

b) Montie had been investing in forex with DaCorta for several years and his experience with DaCorta and forex trading led to the creation of Oasis;

c) the Oasis Pools had never lost money;

d) the Oasis pools were returning a guaranteed 1% monthly return from trading forex, but returns could be higher;

e) the only way the Oasis Pools would lose money was if the entire economy melted down; and

f) pool funds would only be used to trade forex.

57.      D.J.C. followed up with Montie in the fall of 2018 regarding Oasis, and

Montie organized a call with DaCorta.  On October 26, 2018, Montie, DaCorta, and D.J.C.

had a conference call.  Montie and DaCorta reiterated what Montie and Haas said on the

prior conference call in March or April 2018, including that Oasis had a guaranteed

12% annual return, Oasis had never lost money; it would take a significant economic global

event for Oasis to lose money, and pool funds would only be used to trade forex.

58.      D.J.C. invested a total of $750,000 in the Oasis Pools in October 2018, based

on Montie's, Haas's, and DaCorta's representations.

59.      In or about September 2018, Oasis pool participant C.M. learned about Oasis

through some Ambit colleagues.  C.M. knew Montie and Haas through Ambit.  C.M.

participated in an Oasis conference call led by Montie and Haas in or about October 2018.

The following occurred on the conference called:

20

a) Montie opened the call and explained how he and DaCorta became acquainted;

b) Montie stated that the Oasis Pools had never had a down day and there was a guaranteed minimum annual return of 12%;

c) Montie stated that the Oasis Pool traded forex;

d) Haas reiterated that the Oasis Pool made a minimum 12% guaranteed annual return and that the Oasis Pools had never had a down day;

e) Haas stated that the Oasis Pools were in and out of forex trades so quickly there was no risk involved;

f) Haas stated that the only risk to investing with the Oasis Pools was if the entire banking system or economy collapsed; and

g) Haas said pool funds would be used only for forex trading.

60. After the conference call, C.M. emailed Haas asking for further clarification about the risk of loss associated with the Oasis Pools and where pool funds were held. Haas responded "[f]unds are just sitting in an account. Nothing to unwind, no 'projects that went bad' nothing that has to sell, etc... The funds can just be all sent back at once to everyone if need be."

61. A few weeks later, C.M. participated in another Oasis conference call led by Montie and DaCorta. Montie stated that the Oasis Pools guaranteed a minimum 12% annual return. DaCorta stated that the Oasis Pools usually made more than 12% a year and stated that the only risk associated with the Oasis Pools was if the entire banking system collapsed.

62. C.M. invested $66,000 in the Oasis Pools in 2018 based on representations by Montie, Haas, and DaCorta.

63. In 2018, Montie spearheaded a contest amongst Oasis salespeople to get $20 million invested in the Oasis Pools by the end of 2018. As part of the contest, Montie

held a conference with Oasis salespeople on October 30, 2018.  The following occurred on

the call:

   a)  Montie stated the Oasis Pools had taken in more than $11 million, but Montie
       wanted $9 million more;

   b)  Montie stated the Oasis Pools were going to finish October between 1.2% and
       1.4%, there was potential for a big November, and December was projected to
       finish at 1.5%, which should get everyone excited for the contest and the Oasis
       Pools;

   c)  Montie stated he wanted everyone to use December's projected returns of 1.5% to
       talk to people who were on the fence about the Oasis Pools and get them off the
       fence;

   d)  Montie stated the contest prizes included a fishing trip in Louisiana and, if Oasis
       brought in enough money, Oasis would reimburse salespeople for their airfare to
       and hotels in Sarasota for the Oasis holiday party in December;

   e)  Montie stated he wanted to crank up the conference calls Oasis was hosting for
       prospective pool participants, DaCorta was committed to doing one conference
       call a week, and Montie, Haas, and others were committed to doing four to five
       conference calls a week;

   f)  Haas stated he had sent emails to everyone on his distribution list about Oasis
       making 1.5% in December, which generated a lot of excitement and interest in the
       Oasis Pools; and

   g)  Montie stated that the Oasis Pools were north of 17% for the year, closing in on a
       guaranteed 20% for 2018, and everyone should keep these returns in mind as they
       solicited prospective pool participants.

   64.    In early January 2019, Defendant Montie participated in a call with

prospective pool participant L.T. and his investment advisor D.S.  During the call the

following occurred:

   a)  Montie explained that Oasis was a privately held company in the Cayman Islands
       that invested in forex;

b) Montie said that Oasis divided the returns it earned trading forex with pool participants who loaned Oasis money and that interest was deposited into pool participants' accounts on a daily basis;

c) Montie said that any pool participant who brought other pool participants into Oasis would receive a portion of the interest their referral earned from the Oasis Pools;

d) Montie said that Oasis had never had a down day trading forex and portrayed Oasis as "no risk;"

e) Montie said there was no income or net worth requirements for investing in Oasis;

f) D.S. asked Montie how Oasis would calculate L.T.'s minimum IRA distribution and whether Oasis would be issuing year-end tax reporting statements, as these were critical pieces of information for L.T. and required by the IRS, to which Montie responded that he was not familiar with these requirements; and

g) in reviewing sample Oasis account statements with Montie, D.S. remarked that Oasis's returns were incredible and inquired why other large players in the forex market such as large investment banks were not able to produce the returns Oasis generated, to which Montie responded that Oasis was working a $4-7 trillion currency market and wanted to share this with other people.

65. On January 24, 2019, Oasis Pool Participants C.B. and L.B, a couple from Northport, Florida who invested their IRA and life savings in the Oasis Pools based on representations made by Defendant Montie, met with a person they believed to be a prospective pool participant ("Prospective Pool Participant #1") and shared their experiences with Oasis. C.B. and L.B. told Prospective Pool Participant #1 that Defendant Montie told the couple the following:

a) the Oasis Pools were investing in forex;

b) pool participants would receive a minimum return of 12% per year;

c) pool participants would earn an additional 25% of the returns of any pool participant they referred to Oasis;

d) Montie, as a favor, would allow the couple to get referral fees from a pool participant who recently invested a large sum in the Oasis Pools, so the couple would earn additional interest based on this referral;

e) DaCorta traded forex for the Oasis Pools and was the brains of the operation;

f) the only time the Oasis Pools lost money was about seven years ago when the Oasis Pools were just getting started and only Montie's money was lost; and

g) even though pool participants are called lenders, they are really investors.

66. On January 25, 2019 Defendant Montie had a telephone call with Prospective Pool Participant #1. Prospective Pool Participant #1 told Montie he was interested in investing in the Oasis Pools. In response, Montie stated the following:

a) Montie started Oasis about eight years ago after meeting Defendant DaCorta in Poughkeepsie, New York;

b) Montie gave DaCorta $25,000 to trade in October 2011 and within approximately seventy days DaCorta had turned it into $37,000 trading forex;

c) in January 2012, Montie brought in some friends and family and DaCorta started trading their money (approximately $81,000);

d) in seven years Oasis has grown to having $130 million under management;

e) the Oasis Pools earned a 22% return in 2017 and a 21% return in 2018;

f) the Oasis Pools average a 1% monthly return and have never had a losing month;

g) the Oasis Pools are a lot less risky than the stock market;

h) Montie had all of his friends and family involved in the Oasis Pools and they were doing extremely well; and

i) pool participants' funds are used only to trade forex.

67.     On January 30, 2019, Defendant Duran met with Prospective Pool Participant #1 at Oasis's offices in Longboat Key.  Prospective Pool Participant #1 indicated he was interested in investing in the Oasis Pools.  In response, Duran stated the following:

a)      the Oasis Pools would return a minimum of 12% per year;

b)      when the Oasis Pools made more than 12% a year, Oasis paid 25% of these additional returns back to pool participants and 75% of these additional returns went "to the house" to pay OIG's expenses, fees, salaries, referral fees, and to purchase real estate;

c)      the Oasis Pools made a 21% return in 2018;

d)      the Oasis Pools had $100 million under management;

e)      the Oasis Pools' trading platform could not lose money unless there was a bigger problem in the financial markets and people were going to supermarkets with shotguns;

f)      Duran invested in the Oasis Pools, has been helping DaCorta with the day-to-day operations of OIG because he wants to be close to his money; and has been getting money wired to his accounts every day at 7:30 p.m.;

g)      DaCorta was the head trader for the Oasis Pools and Oasis traded forex twenty-four hours a day, five days a week, with Oasis traders working three shifts; and

h)      OIG purchased OIG's office and personal residences for Defendants DaCorta, Anile and Duran.

68.     On February 20, 2019, Defendant Duran sent Prospective Pool Participant #1 an email from fduran@oasisig.com entitled "Fw:  wire instructions.pdf."  The email states that funds should be wired to account XXXXXX0764 at Bank #2.  The beneficiary was designated as Relief Defendant Mainstream Fund Services, Inc., with a reference to "fbo Oasis International Group, Ltd."

69.     That same day, Duran sent Prospective Pool Participant #1 another email from fduran@oasisig.com, attaching a sample promissory note.  The attachment is entitled "PROMISSORY NOTE AND LOAN AGREEMENT" and the maker of the note is "Oasis International Group, Ltd."  The note states that payee would receive the greater of interest calculated at 12% per year or 25% of the Transaction Fees, which were defined as "the fees charged by OIG upon the Loan Amount in its ordinary course of business through a proprietary trading account" of OIG.  The Promissory Note is signed by Defendant DaCorta as CEO of OIG.  The note is dated June 29, 2018.

70.     On March 7, 2019, Defendant Duran met with Prospective Pool Participant #1 at Oasis's offices in Longboat Key.  Prospective Pool Participant #1 explained he was interested in investing a large sum in the Oasis Pools.  In response, Defendant Duran stated the following:

a)     when pool participants invest money in the Oasis Pools, their funds will be "at play" trading forex immediately;

b)     the Oasis Pools paid a minimum 12% annual return from forex trading, but pool participants could earn extra if the Oasis Pools made a higher return trading forex;

c)     the Oasis Pools made a 21% return trading forex in 2018, and all pool participants earned more than 12% in 2018;

d)     the Oasis Pools have never had a losing year, and pool participants could never lose money trading in the Oasis Pools;

e)     pool participants have the option to withdraw their trading profits immediately or the profits automatically get rolled into their principal investment;

f)     the Oasis Pools' trading returns were wired to pool participants at 7:30 p.m. daily, Monday through Friday;

g) pool participants are called lenders to avoid investment in the Oasis Pools being called a security;

h) DaCorta was not earning a big salary from Oasis or the Oasis Pools because he makes what he trades and "we all eat from the same pot;"

i) all Oasis fees and expenses are paid from the Oasis "house" side and not from pool participants' investments in the Oasis Pools; and

j) pool participants' funds would be used only to trade forex and would not be used to invest in real estate, though $15 to $16 million of real estate owned by Oasis is collateral for the pool participants' promissory notes.

71. That same day, Duran sent Prospective Pool Participant #1 an email from fduran@oasisig.com with a link to open an account at OIG located at the web address https://www.oasisigltd.com. When Prospective Pool Participant #1 clicked on the link there were two documents to review and approve: a "Promissory Note and Loan Agreement" and "Agreement and Risk Disclosures." The "Agreement and Risk Disclosures" document stated, among other things:

a) OIG provided no collateral to the Lender in connection with any money loaned to OIG;

b) OIG could use the funds loaned to it by pool participants for any purpose whatsoever and could transfer the funds to other OIG accounts; and

c) OIG could invest money loaned to it by the pool participant in forex or spot metal trading, which the Agreement and Risk Disclosures noted is highly speculative and suitable for only certain investors.

72. On March 22, 2019, Defendant Duran had a telephone call with Prospective Pool Participant #1, who indicated he was concerned about the "Agreement and Risk Disclosures" document. Duran responded to Prospective Pool Participant #1's concerns about the "Agreement and Risk Disclosures" document by assuring him that:

a)     the document was not binding and by clicking "agree" he was only acknowledging that he read the document;

b)     his funds would only be invested in forex;

c)     his funds would not be used to purchase real estate;

d)     his funds could never depreciate;

e)     he would receive a guaranteed 12% annual return even if the Oasis Pools did not earn that much, because OIG makes up the difference;

f)     pool participants' returns were from forex trading profits;

g)     OIG paid fees, salaries, and expenses and purchased real estate and precious metal from "house" money, which was 75% of any returns the Oasis Pools made above 12%;

h)     OIG purchased real estate and precious metals to shore up its strength and protect investors;

i)     OIG owned enough gold that even if the economy turned down, no one would miss a beat; and

j)     Duran's investment in the Oasis Pools, which he made over two years ago, was doing very well.

73.     Defendants DaCorta's, Montie's, Duran's, and Haas's representations were false because, as described further below, Defendants did not use all of pool participants' funds to engage in forex trading and instead misappropriated the majority of pool funds— over $47 million—to make Ponzi payments and for unauthorized personal and business expenses, including real estate and luxury car purchases, tuition payments, and investments in other, non-forex business ventures.

74.     Defendants' representations about the profitability of the Oasis Pools were false. DaCorta lost all of the pool funds deposited into the Oasis Pools' forex accounts through poor trading. The Oasis Pools' actual trading returns in 2017 were not 22%, but

28

negative 45%.  The Oasis Pools' actual trading returns in 2018 were not 21%, but negative 96%.

75.     Defendants' representations regarding the risk associated with the Oasis Pools were false.  Investment in the Oasis Pools was not riskless.  The forex trades in the Oasis accounts had a 100:1 leverage ratio and carried a high degree of risk.  In fact, the Oasis Pools could rapidly lose all the funds deposited into the forex accounts and lose more than what was initially deposited.

76.     Defendants' representations about Oasis having over $100 million under management were false.  Although Defendants may have received as much as $100 million from pool participants during the life of the scheme, very little of those funds were actively traded by DaCorta, and even those funds that were traded were lost by DaCorta.

77.     Defendants' statements that pool participants' investments were backed-up by $15 to $16 million in real estate owned by OIG were false because OIG did not own $15 to $16 million in real estate.

78.     DaCorta made knowing material misrepresentations and omissions about his trading history, the Oasis Pools' profitability, the risk of loss associated with the Oasis Pools and forex trading, that pool funds would be used only to trade forex, and that Oasis had $120 million under management because, as discussed below, he knew he was subject to an NFA ban, losing money trading forex, and misappropriating pool funds.

79.     It was highly unreasonable for Montie, Haas, and Duran to represent that the Oasis Pools made a minimum 12% return with little to no risk when they knew Oasis's trading results were not audited, and they did not verify the legitimacy of these claims.

80.     It was highly unreasonable for Montie, Haas, and Duran to represent, and to acquiesce to DaCorta's and others' representations, that the Oasis Pools and trading forex had limited risk because trading forex leveraged at 100:1 is risky; and Montie, Haas, and Duran did not verify the legitimacy of this claim.

81.     It was highly unreasonable for Montie to acquiesce to statements DaCorta made in his presence that investing in the Oasis Pools was as safe as having money in a bank account because trading forex leveraged at 100:1 is far more risky than having money in an insured bank account, and Montie did not verify the legitimacy of this claim.

82.     Montie and Duran knowingly misrepresented or were highly unreasonable in representing that pool funds were being invested only in forex when they knew that Oasis was making non-forex investments and they did not verify that Oasis's non-forex investments were made with trading profits.

83.     Haas knowingly misrepresented that pool funds were being invested only in forex because, as described below, Haas was misappropriating pool funds from Satellite Holdings accounts.

84.     It was highly unreasonable for Montie, Haas, and Duran to represent that Oasis and its principals were trustworthy and financially successful when neither Oasis Management nor OIG kept regular books and records or prepared financial statements.

85.     Duran made knowing misrepresentations that he invested in the Oasis Pools and was watching his money grow because Duran never invested in the Oasis Pools.

86.     Montie knowingly misrepresented that he could get a pool participant's funds out of Oasis because he had log-ins to the Oasis bank accounts when he was not a signatory to and did not have log-ins to any Oasis bank accounts.

87.     It was highly unreasonable for Montie to solicit others to invest their IRAs in the Oasis Pools when he was unaware of IRS requirements for IRAs.

88.     It was highly unreasonable for Montie, Haas, and Duran to solicit U.S. residents for the Oasis Pools when they knew that OIG's website states that OIG was not offering services or products to U.S. persons.

89.     Defendants' misrepresentations and omissions to pool participants operated as a fraud on pool participants.

90.     In soliciting pool participants for the Oasis Pools, Defendants made no attempt to determine if they were eligible contract participants ("ECPs") as defined in Section 1a(18) of the Act, 7 U.S.C. § 1a(18) (2012)—i.e., individuals with $10,000,000 invested on a discretionary basis—and upon information and belief many, if not all, of the pool participants are not ECPs.

**E.     Misappropriation of Pool Funds**

91.     During the Relevant Period, pool participants sent checks and wired funds for investments in the Oasis Pools to one or more of the following bank accounts:

| Account | Pool Funds Received |
|---|---|
| OM Accounts at Bank #1 (as of February 28, 2019) | $24,208,396.74 |
| Satellite Holdings Accounts at Bank #1 (as of March 8, 2019) | $14,373,770.83 |

31

| Account | Pool Funds Received |
|---|---|
| Fundadministration/Mainstream Accounts at Bank #1 and Bank #5 (as of March 8, 2019) | $36,534,648.64 |
| **Total Pool Funds Received** | **$75,116,816.21** |

92. DaCorta controlled and was the signatory on OM Accounts, Haas controlled and was the signatory on the Satellite Holdings Accounts; and Anile controlled the Funadministration/Mainstream Accounts.

93. Instead of using all or substantially all of pool participants' funds for forex trading, as promised, Defendants DaCorta, Anile, and Haas knowingly misappropriated the majority of pool participants' funds from the OM, Mainstream/Fundadministration, and Satellite Holdings accounts as follows:

| Use of Pool Funds | Amount |
|---|---|
| Ponzi Payments | $28,944,355.27 |
| Real estate purchases and maintenance or improvements to real estate including, but not limited to, the Oasis office building and residences for Defendants DaCorta, Anile, and Duran. This category includes transfers to Relief Defendants 444 Gulf of Mexico, 4064 Founders Club, 6922 Lacantera, and 13318 Lost Key Place. | $7,803,932.04 |
| Personal expenses, including but not limited to, private plane charters, exotic vacations, sports tickets, pet supplies, loans to family members, and college and study abroad tuition. | $6,981,839.06 |
| Non-forex business expenses and business ventures owned by Defendants, including but not limited to, transfers to Relief Defendants Bowling Green, Roar of the Lion, Lagoon, and 4Oaks. | $3,332,861.44 |

| Use of Pool Funds | Amount |
|---|---|
| Vehicle purchases, including a Maserati and Land Rover for DaCorta. | $111,463.82 |
| **Total** | **$47,174,451.63** |

94.     DaCorta's, Anile's, and Haas's misappropriation of pool funds operated as a fraud on pool participants.

95.     As of February 28, 2019, only approximately $7.1 million remained in the Mainstream Accounts, $2.7 million remained in the OM accounts, and $240,000 remained in the Satellite Holdings accounts.

**F.     False Account Statements to Pool Participants**

96.     Throughout the Relevant Period, pool participants had access to online account statements generated by OIG at Defendant DaCorta's direction.  Pool participants accessed their account statements in the "back office" section of the Oasis website.

97.     These account statements purport to provide, among other things:  (1) the pool participants' balance at the beginning of each month; (2) pool participants' daily returns earned in an amount totaling 1% per month, which purports to reflect the amount of interest pool participants were earning each day from the Oasis Pools; (3) pool participants' daily special interest returns at 25% of transaction fees, which purports to reflect the amount of extra interest pool participants were earning each day from either referral arrangements or the Oasis Pools' generating more than the guaranteed 12% annual return; and (4) pool participants' "additional loans," which purports to reflect returns that were earned but not withdrawn and therefore rolled into the pool participants' "principal."

33

98.     These account statements were false because the Oasis Pools were losing money.  Thus, any returns or increased principal reflected on pool participants' account statements, which were purportedly based on forex trading in the Oasis Pools, were a complete fiction.

99.     These false account statements concealed the Oasis Pools' trading losses and Defendants' misappropriation of pool funds and operated as a fraud on pool participants.

100.    DaCorta knew these account statements were false because he knew the Oasis Pools were not profitable and that pool funds had been misappropriated.

**G.      Defendants Failed To Register with the Commission**

101.    During the Relevant Period, Defendants OIG, OM, and Satellite Holdings, by and through their officers, employees or agents, used the mails, electronic mails, wire transfers, websites, and other means or instrumentalities of interstate commerce, to solicit pool participants and prospective pool participants and to receive property from pool participants.

102.    During the Relevant Period, OIG, OM, and Satellite Holdings acted as CPOs of the Oasis Pools because they were entities engaging in a business that is of the nature of a commodity pool and, in connection with that business, solicited and/or accepted pool funds for a pooled investment vehicle that is not an ECP and that engages in transactions described in Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2012), other than on or subject to the rules of a designated contract market ("retail forex transactions").

103.    During the Relevant Period, OIG, OM, and Satellite Holdings were not statutorily exempt or excluded from registration as CPOs.  Moreover, OIG, OM, and Satellite

34

Holdings never filed any electronic or written notice with the NFA that they were exempt or excluded from registration as CPOs, as required by Regulations 4.5(c) and 4.13(b)(1).

104.    During the Relevant Period, OIG, OM, and Satellite Holdings were never registered with the Commission as CPOs.

105.    During the Relevant Period, DaCorta, Montie, Duran, and Haas acted as APs of CPOs because they solicited funds or property for participation in a pooled investment vehicle that is not an ECP and that engages in retail forex transactions.

106.    During the Relevant Period, DaCorta, Montie, Duran, and Haas were never registered with the Commission as APs of CPOs.

**H.    Receipt and Commingling of Pool Funds**

107.    Defendants OIG, OM, and Satellite Holdings, while acting as CPOs of the Oasis Pools, received pool funds that were not in the name of the Oasis Pools and commingled pool funds with non-pool property by depositing pool funds into the bank accounts of OM, Satellite Holdings, Fundadministration, and Mainstream, rather than separate bank accounts specifically designated for the Oasis Pools.

108.    While acting as CPOs of the Oasis Pools, Defendants OIG, OM, and Satellite Holdings commingled pool funds with non-pool property by transferring pool funds from the OM, Satellite Holdings, Fundadministration, and Mainstream bank accounts into other accounts holding non-pool funds.

### I.  Failure To Provide Pool Disclosures and Other Relevant Documents

109.    At or near the time of investment, Defendants provided potential pool participants with a document titled "Agreement and Risk Disclosures," along with a "Promissory Note and Loan Agreement."

110.    The Agreement and Risk Disclosures purported to alert investors to the risks associated with investing in forex, but at the same time, the Promissory Note and Loan Agreement guarantees pool participants a 12% annual return.

111.    Defendants' Agreement and Risk Disclosures did not include the required cautionary statement to investors or a full and complete risk disclosure, including the risks involved in foreign futures contracts and retail forex trading.

112.    In addition to Defendants' inadequate cautionary statements and risk disclosures, Defendants also failed to provide pool participants with additional required information, including but not limited to, the fees and expenses incurred by the Oasis Pools, past performance disclosures, and a statement that the CPO is required to provide all pool participants with monthly or quarterly account statements, as well as an annual report containing financial statements certified by an independent public accountant.

### J.  Controlling Person Liability

113.    During the Relevant Period, DaCorta was a controlling person of OIG.  He co-founded and was a principal shareholder, director, president, chief executive officer, and chief investment officer of OIG.  DaCorta signed promissory notes provided to pool participants guaranteeing a minimum 12% return from the Oasis Pools.  According to OIG's website, DaCorta is responsible for all investment decisions, trading execution, services,

sales, clearing and operations of OIG. DaCorta did not act in good faith or knowingly induced OIG's fraudulent acts.

114. During the Relevant Period, DaCorta was also a controlling person for OM. He opened bank accounts for OM in November 2011 and is the sole signatory on these accounts. DaCorta did not act in good faith or knowingly induced OM's fraudulent acts.

115. During the Relevant Period, Defendant Anile was a controlling person of OIG. He co-founded and was a principal shareholder, director, and president of OIG. According to Oasis's website, Anile has responsibility for staffing, guiding, and managing OIG's vision, mission, strategic plan, and direction. Additionally, Anile opened trading accounts for the Oasis Pools and controlled OIG bank accounts. Anile assisted in facilitating real estate purchases with pool funds and in diverting pool funds from OIG to other business entities and Relief Defendants. Anile did not act in good faith or knowingly induced OIG's fraudulent acts.

116. During the Relevant Period, Defendant Montie was a controlling person of OIG. He co-founded and was an OIG principal shareholder, director and vice president. He was OIG's executive director of sales. Montie solicits prospective pool participants and introduces them to OIG and/or DaCorta. Montie did not act in good faith or knowingly induced OIG's fraudulent acts.

117. Throughout the Relevant Period, Defendant Haas was a controlling person of Defendant Satellite Holdings. Haas is the director of Satellite, and he opened and was the sole signatory on bank accounts in the name of Satellite Holdings, which received funds from pool participants. Haas was in charge of assisting pool participants who wished to invest

their IRAs and/or retirement funds in the Oasis Pools. He signed promissory notes guaranteeing pool participants a 12% annual return from the Oasis Pools. Haas did not act in good faith or knowingly induced Satellite Holding's fraudulent acts.

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

**Violations of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2012) and Regulation 5.2(b), 17 C.F.R. § 5.2(b) (2018)
(Forex Fraud by Misrepresentations, Omissions,
False Statements, and Misappropriation)**

#### (All Defendants)

118.    Paragraphs 1 through 117 are realleged and incorporated herein by reference.

119.    Section 4b(a)(2)(A)-(C) of the Act makes it unlawful:

> (2)     for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, **_other than_** on or subject to the rules of a designated contract market
>
> > (A) to cheat or defraud or attempt to cheat or defraud the other person;
> >
> > (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;
> >
> > (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

7 U.S.C. § 6b(a)(2)(A)-(C) (2012) (emphasis added).

120.     Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi) (2012), defines an ECP (eligible contract participant), in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.  7 U.S.C. § 1a(17) defines an eligible commercial entity, or ECE, as an ECP that meets certain additional requirements, both financially and in its business dealings.

121.     Pursuant to Section 2(c)(2)(C)(iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(iv) (2012), Section 4b of the Act applies to the forex transactions described herein "as if" they were a contract of sale of a commodity for future delivery.

122.     Regulation 5.2(b) provides, in relevant part, that:

> [i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction:
>
> > (1)  To cheat or defraud or attempt to cheat or defraud any person;
> >
> > (2)  Willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or
> >
> > (3)  Willfully to deceive or attempt to deceive any person by any means whatsoever.

17 C.F.R. § 5.2(b) (2018).

123.     By reason of the conduct described above, Defendants OIG, OM, and Satellite Holdings (acting as a common enterprise), by and through their officers, employees and

agents and Defendants DaCorta, Anile, Montie, Duran, and Haas, in connection with retail forex transactions, knowingly or recklessly:  (1) cheated or defrauded or attempted to cheat or defraud pool participants and  (2) deceived or attempted to deceive pool participants by any means.

124.    By reason of the foregoing, Defendants OIG, OM, and Satellite Holdings (acting as a common enterprise), by and through their officers, employees, and agents and Defendants DaCorta, Anile, Montie, Duran, and Haas violated 7 U.S.C. § 6b(a)(2)(A) and (C) and 17 C.F.R. § 5.2(b)(1) and (3).

125.    By reason of the conduct described above, Defendants OIG, OM, and Satellite Holdings (acting as a common enterprise), by and through their officers, employees and agents and Defendant DaCorta knowingly or recklessly made or caused to be made false account statements.

126.    By reason of the foregoing, Defendants OIG, OM, and Satellite Holdings (acting as a common enterprise), by and through their officers, employees, and agents and Defendant DaCorta violated 7 U.S.C. § 6b(a)(2)(B) and 17 C.F.R. § 5.2(b)(2).

127.    The foregoing acts, omissions, and failures occurred within the scope of the individual defendants' employment or office with OIG, OM, and/or Satellite Holdings (acting as a common enterprise).  Therefore, OIG, OM, and Satellite Holdings are liable for their acts, omissions, and failures in violation of 7 U.S.C. § 6b(a)(2)(A)-(C)  and 17 C.F.R. § 5.2(b)(1)-(3), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2018).

128. Defendants DaCorta, Anile, Montie, and Haas control OIG, OM, and/or Satellite Holdings, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, OIG's, OM's, and Satellite Holdings' conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b) (2012), DaCorta, Anile, Montie, and Haas are liable for OIG's, OM's, and Satellite Holdings' violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3).

129. Each misrepresentation, omission of material fact, false statement, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3).

## COUNT TWO

### Violation of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B)
### (Fraud and Deceit by CPOs and APs of CPOs)

### (All Defendants)

130. Paragraphs 1 through 117 are re-alleged and incorporated herein by reference.

131. Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2012), defines a CPO, in relevant part, as any person:

> engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—

> (I) commodity for future delivery, security futures product, or swap; [or]
> (II) agreement, contract, or transaction described in [S]ection 2(c)(2)(C)(i) [of the Act] or [S]ection 2(c)(2)(D)(i) [of the Act].

132.     Pursuant to Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2018), and subject to certain exceptions not relevant here, any person who operates or solicits funds, securities, or property for a pooled investment vehicle and engages in retail forex transactions is defined as a retail forex CPO.

133.     Pursuant to Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I) (2012), "[a]greements, contracts, or transactions" in retail forex and accounts or pooled investment vehicles "shall be subject to . . . section[ ] 6*o* [of the Act]," except in circumstances not relevant here.

134.     During the Relevant Period, Defendants OIG, OM, and Satellite Holdings (acting as a common enterprise) engaged in a business, for compensation or profit, that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including in relevant part transactions in futures and forex; therefore, Defendants, OIG, OM, and Satellite Holdings acted as a CPO, as defined by 7 U.S.C. § 1a(11).

135.     During the Relevant Period, Defendants OIG, OM, and Satellite Holdings (acting as a common enterprise) were not registered with the Commission as CPOs.

136.     Regulation 1.3, 17 C.F.R. § 1.3 (2018), defines an AP of a CPO as any natural person associated with a CPO

> as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or

property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

137.    Pursuant to 17 C.F.R. § 5.1(d)(2), any person associated with a CPO "as a partner, officer, employee, consultant or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves:  (i) [t]he solicitation of funds, securities, or property for a participation in a pooled vehicle; or (ii) [t]he supervision of any person or persons so engaged" is an AP of a retail forex CPO.

138.    During the Relevant Period, Defendants DaCorta, Montie, Duran, and Haas were associated with a CPO as a partner, officer, employee or consultant, or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool or the supervision of any person or persons so engaged.  Therefore, Defendants DaCorta, Montie, Duran, and Haas were APs of a CPO as defined by 17 C.F.R. § 1.3.

139.    During the Relevant Period, Defendants DaCorta, Montie, Duran, and Haas were not registered with the Commission as APs of a CPO.

140.    Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1) (2012), prohibits CPOs and APs of CPOs, whether registered with the Commission or not, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes or artifices to defraud any client or participant or prospective client or participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

141.    By reason of the foregoing, Defendants OM, OIG, and Satellite Holdings (acting as a common enterprise) and Defendants DaCorta, Montie, Duran, and Haas, through

43

use of the mails or any means or instrumentality of interstate commerce: (1) knowingly or recklessly employed devices, schemes or artifices to defraud pool participants and prospective pool participants, or (2) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon pool participants or prospective pool participants.

142.     By reason of the foregoing, Defendants OM, OIG, and Satellite Holdings (acting as a common enterprise) and Defendants DaCorta, Montie, Duran, and Haas violated 7 U.S.C. § 6*o*(1).

143.     The foregoing acts, omissions, and failures occurred within the scope of the individual defendants' employment or office with OIG, OM, or Satellite Holdings (acting as a common enterprise). Therefore, OIG, OM, and Satellite Holdings (acting as a common enterprise) are liable for their acts, omissions, and failures in violation of 7 U.S.C. § 6*o*(1).

144.     Defendants DaCorta, Anile, Montie and Haas control OIG, OM, and/or Satellite Holdings, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, OIG's, OM's and Satellite Holdings's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b) (2012), DaCorta, Anile, Montie, and Haas are liable for OIG's, OM's and Satellite Holdings's violations of 7 U.S.C. § 6*o*(1).

145.     Each misrepresentation, omission of material fact, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1).

## COUNT THREE

**Violation of Sections 2(c)(2)(C)(iii)(I)(cc), 4k(2), 4m(1) of the Act,
7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), 6m(1) (2012)
and Regulation 5.3(a)(2), 17 C.F.R. § 5.3(a)(2)
(Failure To Register as a CPO and Retail Forex CPO
and AP of a CPO and AP of Retail Forex CPO)**

**(All Defendants)**

146.    Paragraphs 1 through 117 are re-alleged and incorporated herein by reference.

147.    Subject to certain exceptions not relevant here, Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012), states that it shall be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such . . . [CPO]."

148.    Subject to certain exceptions not relevant here, Section 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) (2012), states that a

> person, unless registered in such capacity as the Commission by rule, regulation, or order shall determine and a member of a futures association registered under section 17, shall not . . .
> . . . .
> (cc) operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with [retail forex contracts, agreements, or transactions].

149.    For the purposes of retail forex transactions, a CPO is defined in Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2018), as any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an ECP, as defined in Section 1a(18) of the Act, 17 U.S.C. § 1a(18) (2012), and who engages in retail forex transactions.

150.     Except in circumstances not relevant here, Regulation 5.3(a)(2)(i),

17 C.F.R. § 5.3(a)(2)(i) (2018), requires those that meet the definition of a retail forex CPO

under 17 C.F.R. § 5.1(d) to register as a CPO with the Commission.

151.     Subject to certain exceptions not relevant here, Section 4k(2) of the Act, 7

U.S.C. § 6k(2) (2012), states that it shall be

> unlawful for any person to be associated with a [CPO] as a partner,
> officer, employee, consultant, or agent . . . in any capacity that
> involves
>
> (i)      the solicitation of funds, securities, or property for a
>          participation in a commodity pool or
> (ii)     the supervision of any person or persons so engaged,
>          unless such person is registered with the Commission
>          under this chapter as an [AP] of such [CPO] . . . .

152.     For the purposes of retail forex transaction, an AP of a CPO is defined in 17

C.F.R. § 5.1(d)(2) as any natural person associated with a retail forex CPO as a partner,

officer, employee, consultant, or agent (or any natural person occupying a similar status or

performing similar functions) in any capacity that involves soliciting funds, securities or

property for participation in a pooled investment vehicle or supervising persons so engaged.

153.     Except in certain circumstances not relevant here, 17 C.F.R. § 5.3(a)(2)(ii),

requires those that meet the definition of an AP of a retail forex CPO under 17 C.FR. § 5.1(d)

to register as an AP of a CPO with the Commission.

154.     By reason of the foregoing, Defendants OIG, OM, and Satellite Holdings

(acting as a common enterprise) engaged in a business, for compensation or profit, that is of

the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise,

and in connection therewith, solicited, accepted, or received from others, funds, securities, or

property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including retail forex transactions; therefore, Defendants OIG, OM, and Satellite Holdings acted as CPOs, as defined by 7 U.S.C. § 1a(11).

155. Defendants OIG, OM, and Satellite Holdings (acting as a common enterprise), while using the mails or means of interstate commerce in connection with their business as a CPO, were not registered with the Commission as a CPO.

156. By reason of the foregoing, Defendants OIG, OM, and Satellite Holdings (acting as a common enterprise) acted as unregistered CPOs in violation of 7 U.S.C. § 6m(1).

157. By reason of the foregoing, Defendants OIG, OM, and Satellite Holdings (acting as a common enterprise) solicited funds, securities, or property for a pooled investment vehicle from investors who were not ECPs, as defined by 7 U.S.C. § 1a(18), for the purpose of trading in retail forex transactions (as defined by 17 C.F.R. § 5.1(m)); thus, OIG, OM, and Satellite Holdings (acting as a common enterprise) acted as CPOs engaged in retail forex transactions as defined by 17 C.F.R. § 5.1(d)(1).

158. Defendants OIG, OM, and Satellite Holdings (acting as a common enterprise) were not registered with the Commission as CPOs engaged in retail forex transactions, and therefore violated 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(i).

159. During the Relevant Period, Defendants DaCorta, Montie, Duran, and Haas associated with a retail forex CPO (as defined in 17 C.F.R. § 5.1(d)) as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions)), in a capacity that involved the solicitation of funds, securities,

or property for a participation in a commodity pool or the supervision of persons so engaged; therefore, Defendants DaCorta, Montie, Duran, and Haas acted as APs of CPOs as defined by 17 C.F.R. § 1.3.

160. During the Relevant Period, Defendants DaCorta, Montie, Duran, and Haas were not registered with the Commission as APs of a CPO; thus, Defendants DaCorta, Montie, Duran, and Haas acted as unregistered APs of CPOs in violation of 7 U.S.C. § 6k(2).

161. By reason of the foregoing, Defendants DaCorta, Montie, Duran, and Haas associated with a retail forex CPO (as defined in 17 C.F.R. § 5.1(d)) as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions)), in a capacity that involved the solicitation of funds, securities, or property for a participation in a retail forex pool or the supervision of persons so engaged; therefore, Defendants DaCorta, Montie, Duran, and Haas acted as APs of CPOs as defined by 17 C.F.R. § 5.1(d)(2).

162. Defendants DaCorta, Montie, Duran, and Haas were not registered as APs of a CPO engaged in retail forex transactions, and therefore violated 17 C.F.R. § 5.3(a)(2)(ii).

163. Defendants DaCorta, Anile, Montie, and Haas control OIG, OM, and/or Satellite Holdings, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, OIG's, OM's and Satellite Holdings's conduct alleged in this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), DaCorta, Anile, Montie, and Haas are liable for OIG's, OM's, and Satellite Holdings's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) and 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

164.     Each instance that Defendants OIG, OM, and Satellite Holdings acted as a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

165.     Each instance that Defendants DaCorta, Montie, Duran, and Haas acted as an AP of a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

## COUNT FOUR

**Violation of Regulation 4.20(b)-(c), 17 C.F.R. § 4.20(b)-(c) (2018)**
**(Failure To Receive Pool Funds in Pools' Names**
**and Commingling Pool Funds)**

**(Defendants OIG, OM, Satellite Holdings, DaCorta, Anile, Montie, and Haas)**

166.     Paragraphs 1 through 117 are re-alleged and incorporated herein by reference.

167.     Regulation 5.4, 17 C.F.R. § 5.4 (2018), states that Part 4 of the Regulations, 17 C.F.R. pt. 4 (2018), applies to any person required to register as a CPO pursuant to Part 5 of the Regulations, 17 C.F.R. pt. 5 (2018), relating to forex transactions.

168.     Regulation 4.20(b), 17 C.F.R. § 4.20(b) (2018), prohibits CPOs, whether registered or not, from receiving pool participants' funds in any name other than that of the pool.

169.     17 C.F.R. § 4.20(c) (2018), prohibits a CPO, whether registered or not, from commingling the property of any pool it operates with the property of any other person.

170.     By reason of the foregoing, Defendants OIG, OM, and Satellite Holdings (acting as a common enterprise), while acting as CPOs for the Oasis Pools, failed to receive

to pool participants' funds in the names of the Oasis Pools and commingled the property of the Oasis Pools with property of Defendants or others.

171. By reason of the foregoing, Defendants OIG, OM, and Satellite Holdings (acting as a common enterprise) violated 17 C.F.R. § 4.20(b)-(c).

172. Defendants DaCorta, Anile, Montie, and Haas control OIG, OM, and/or Satellite Holdings, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, OIG's, OM's, and Satellite Holdings's conduct alleged in this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), DaCorta, Anile, Montie, and Haas are liable for OIG's, OM's, and Satellite Holdings's violations of 17 C.F.R. § 4.20(b)-(c).

173. Each act of improperly receiving pool participants' funds and commingling the property of the Oasis Pools with non-pool property, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.20(b)-(c).

## COUNT FIVE

### Violation of Regulation 4.21, 17 C.F.R. § 4.21 (2018)
### (Failure To Provide Pool Disclosures)

### (Defendants OIG, OM, Satellite Holdings, DaCorta, Anile, Montie, and Haas)

174. Paragraphs 1 through 117 are re-alleged and incorporated herein by reference.

175. Regulation 5.4, 17 C.F.R. § 5.4 (2018), states that Part 4 of the Regulations, 17 C.F.R. pt. 4 (2018), applies to any person required to register as a CPO pursuant to Part 5 of the Regulations, 17 C.F.R. pt. 5 (2018), relating to forex transactions.

176. Regulation 4.21, 17 C.F.R. § 4.21 (2018), provides that

> each commodity pool operator registered or required to be registered under the Act must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool prepared in accordance with §§ 4.24 and 4.25 by no later than the time it delivers to the prospective participant a subscription agreement for the pool . . . .

177. By reason of the foregoing, Defendants OIG, OM, and Satellite Holdings (acting as a common enterprise) failed to provide to prospective pool participants with pool disclosure documents in the form specified in Regulations 4.24 and 4.25, 17 C.F.R. §§ 4.24, 4.25 (2018).

178. By reason of the foregoing, Defendants OIG, OM, and Satellite Holdings (acting as a common enterprise) violated 17 C.F.R. § 4.21.

179. Defendants DaCorta, Anile, Montie, and Haas control OIG, OM, and/or Satellite Holdings, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, OIG's, OM's, and Satellite Holdings' conduct alleged in this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), DaCorta, Anile, Montie, and Haas are liable for OIG's, OM's, and Satellite Holdings's violations of 17 C.F.R. § 4.21.

180. Each failure to furnish the required disclosure documents to prospective pool participants and pool participants, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.21.

## VI.   RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A.    Find that Defendants OIG, OM, Satellite Holdings, DaCorta, Anile, Montie, Duran, and Haas violated Sections 4b(a)(2)(A)-(C), 4k(2), 4m(1), 4o(1)(A)-(B), and 2(c)(2)(iii)(I)(cc) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C),6(k)(2), 6m(1), 6o(1)(A)-(B), 2(c)(2)(iii)(I)(cc) (2012), and Regulations 4.20(b)-(c), 4.21, 5.2(b)(1)-(3), and 5.3(a)(2), 17 C.F.R. § 4.20(b)-(c), 4.21, 5.2(b)(1)-(3), 5.3(a)(2)(iii) (2018);

B.    Enter an order of permanent injunction enjoining Defendants OIG, OM, Satellite Holdings, DaCorta, Anile, Montie, Duran, and Haas, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6m(1), 6o(1)(A)-(B), and 2(c)(2)(iii)(I)(cc) and 17 C.F.R. §§ 4.20(b)-(c), 4.21, 5.2(b)(1)-(3), and 5.3(a)(2);

C.    Enter an order of permanent injunction restraining and enjoining Defendants OIG, OM, Satellite Holdings, DaCorta, Anile, Montie, Duran, and Haas, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

2) Entering into any transactions involving "commodity interests" (as that

term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2018)), for accounts

held in the name of any Defendant or for accounts in which any Defendant

has a direct or indirect interest;

3) Having any commodity interests traded on any Defendants' behalf;

4) Controlling or directing the trading for or on behalf of any other person or

entity, whether by power of attorney or otherwise, in any account

involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for the

purpose of purchasing or selling of any commodity interests;

6) Applying for registration or claiming exemption from registration with the

CFTC in any capacity, and engaging in any activity requiring such

registration or exemption from registration with the CFTC except as

provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2018); and

7) Acting as a principal (as that term is defined in Regulation 3.1(a),

17 C.F.R. § 3.1(a) (2018)), agent, or any other officer or employee of any

person registered, exempted from registration, or required to be registered

with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

D.    Enter an order directing Defendants OIG, OM, Satellite Holdings, DaCorta,

Anile, Montie, Duran, and Haas, as well as any third-party transferee and/or successors

thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received

including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits

derived, directly or indirectly, from acts or practices which constitute violations of the Act

and Regulations as described herein, from April 15, 2014, to the present, including pre-

judgment and post-judgment interest;

E.    Enter an order directing Relief Defendants Mainstream Fund Services, Inc.,

Bowling Green, Lagoon, Roar of the Lion, 444, 4064 Founders Club, 6922 Lacantera,13318 Lost Key and 4Oaks, including any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act or Regulations as described herein, from April 15, 2014, to the present, including pre-judgment and post-judgment interest;

F.      Enter an order requiring Defendants OIG, OM, Satellite Holdings, DaCorta, Anile, Montie, Duran, and Haas, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

G.      Enter an order directing Defendants OIG, OM, Satellite Holdings, DaCorta, Anile, Montie, Duran, and Haas, as well as any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with or among Defendants OIG, OM, Satellite Holdings, DaCorta, Anile, Montie, Duran, and Haas and any of the pool participants  whose funds were received by Defendants OIG, OM, Satellite Holdings, DaCorta, Anile, Montie, Duran, and Haas as a result of the acts and practices that constituted violations of the Act and Regulations as described herein;

H.      Enter an order directing Defendants OIG, OM, Satellite Holdings, DaCorta, Anile, Montie, Duran, and Haas to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2018), for each violation of the Act and

Regulations, as described herein;

   I.  Enter an order requiring Defendants OIG, OM, Satellite Holdings, DaCorta, Anile, Montie, Duran, and Haas to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2012); and

   J.  Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated: June 12, 2019     Respectfully submitted,

          **COMMODITY FUTURES TRADING COMMISSION**

          By: /s/ Jennifer J. Chapin
          Jo E. Mettenburg, jmettenburg@cftc.gov
          TRIAL COUNSEL
          Jennifer J. Chapin, jchapin@cftc.gov
          J. Alison Auxter, aauxter@cftc.gov
          Attorneys for Plaintiff
          COMMODITY FUTURES TRADING COMMISSION
          4900 Main Street, Suite 500
          Kansas City, MO 64112
          (816) 960-7700

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2019, I filed a copy of the foregoing with the Clerk of the Court via the CM/ECF system, which served all parties of record who are equipped to receive service of documents via the CM/ECF system.

I hereby certify that on June 12, 2019, I provided service of the foregoing via electronic mail to:

Gerard Marrone
Law Office of Gerard Marrone P.C.
66-85 73rd Place
Second Floor
Middle Village, NY 11379
gmarronelaw@gmail.com
**COUNSEL FOR DEFENDANT JOSEPH S. ANILE, II**

I hereby certify that on June 12, 2019, I provided service of the foregoing via electronic mail to the following unrepresented party:

Francisco "Frank" L. Duran
fduran@oasisig.com